**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| S.Q., a minor, individually, by and through her Parent EBONY CRUMBLE, and on behalf of all others similarly situated, | CASE NO. |
| EBONY CRUMBLE, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| vs. | **JURY TRIAL DEMAND** |
| KETTLE MORAINE SCHOOL DISTRICT | |
| and | |
| KETTLE MORAINE MIDDLE SCHOOL | |
| and | |
| KETTLE MORAINE HIGH SCHOOL | |
| Defendants. | |

## COMPLAINT AT LAW

NOW COME Plaintiffs, SQ, individually, by and through her Parent EBONY CRUMBLE, and on behalf of all others similarly situated, and EBONY CRUMBLE, individually and on behalf of all others similarly situated (hereinafter collectively "PLAINTIFFS") by and through their attorney, and complaining of Defendants, KETTLE MORAINE SCHOOL DISTRICT, KETTLE MORAINE MIDDLE SCHOOL and KETTLE MORAIN HIGH SCHOOL, states and alleges as follows:

## PARTIES

1.      Plaintiff SQ, a minor, individually, by and through her Parent EBONY CRUMBLE, and on behalf of all others similarly situated, is a resident of the State of Wisconsin and currently resides in Wales, Wisconsin. At all times relevant to this Complaint, Plaintiff SQ was and currently is a resident of Wales, Wisconsin, and enrolled as student at a Kettle Moraine School District school.

2.      Plaintiff EBONY CRUMBLE, individually and on behalf of all others similarly situated, ("hereinafter Ms. Crumble") is a resident of the State of Wisconsin and currently resides in Wales, Wisconsin.

3.      Defendant, KETTLE MORAINE SCHOOL DISTRICT (hereinafter "KMSD"), is a public education school district and governmental entity created under Wisconsin Stat. §118, *et seq.*, At all times relevant to this Complaint, KMSD was engaged in the management and government of said school district and was responsible for the actions of its' employees and for developing and implementing official policy for the district and for protecting its students and supervising its staff.

4.      Defendant, KETTLE MORAINE HIGH SCHOOL (hereinafter "KM High School"), is a publicly funded high school and governmental entity under the care and control of KMSD. At all times relevant to this Complaint, KM High School was engaged in the management and government of said high school, and was responsible for the actions of its' employees and for developing and implementing official policy for the district and for protecting its students and supervising its staff.

5.     Defendant, KETTLE MORAINE MIDDLE SCHOOL (hereinafter "KM Middle School"), is a publicly funded primary school and governmental entity under the care and control of KMSD. At all times relevant to this Complaint, KM Middle School was engaged in the management and government of said high school, and was responsible for the actions of its' employees and for developing and implementing official policy for the district and for protecting its students and supervising its staff.

## JURISDICTION

6.     Jurisdiction is conferred by 28 U.S.C. §§1331, 1343(a)(3) and (a)(4), Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. §1391(a)(2) and (b)(2) because the events giving rise to the claims occurred within this district.

## CIVIL RIGHTS CLAIM

7.     This is, among other claims, a Civil Rights claim brought under 20 U.S.C. §§ 1681-1688, 42 U.S.C. 2000d, et seq. and 42 U.S.C. § 1983, seeking damages, fees, costs and attorney's fees against the Kettle Moraine Defendants.

## PROLOGUE

8.     The United States is immersed in an epidemic. Not one that comes from foreign land, but one that is tragically home bred. It is the epidemic of racism that is once again spreading out of control. And once again, in its path are our children, our most valuable and vulnerable assets.

9.     So enters Kettle Moraine School District, an entity that operates at least in part on public funds. And rather than stepping up, as educators often do, and being a

foundation for unity and cultural appreciation in the community and a source of social strength for all of our children, it has instead thrown up its hands, buried it's head, and surrendered to the chaos it cultivated.

10.     Not only does this oppress and endanger the children of color it is supposed to protect, but all children in its care are harmed by growing up with a deranged sense of diversity. In a very real sense, Kettle Moraine School District has failed this community, and thus has sparked the necessity for this suit.

11.     On information and belief, the ratio of students of color to white students at both KM Middle School and KM High School is less than 1 in 10.

12.     As some of the individuals referred to in this Complaint are minors, their names will not be used, and they will be identified only by initials throughout this document.

13.     Minor Plaintiff SQ, by and through her parent Plaintiff Ebony Crumble, alleges that her civil rights, as well as those of similarly situate students of color, were violated when Defendants KMSD, KM Middle School and KM High School, through their agents, representatives, board of governors, principals, vice-principals, teachers, or any other authorized agent or representative, while acting within the course and scope of that representation, failed to protect SQ and other students from the hostile learning environment cultivated at both Kettle Moraine High School and Kettle Moraine Middle School.

14.     During SQ's enrollment, KMSD, KM High School, and KM Middle School tolerated severe, persistent and pervasive acts of student-on-student racial harassment and bullying, including cyberbullying.

15.     SQ, as well as other similarly situated students, have been harmed by KMSD's failure to protect her, from these persistent and pervasive acts.

16.     The scope of the acts and negligence outlined in this Complaint go back as far as the fall of 2017, but on information and belief, KMSD's negligence extends much farther in the past, and has earned it the reputation of being a "bad" school for racial diversity.

17.     KMSD's failure is disturbing, as it was on notice in the past about this general problem over the course of many years. It is even more pronounced in the light of the fact they were on notice about SQ's specific experiences and failed to effectively address them. Moreover, their failure is particularly egregious in that, in the era of racial sensitivity, SQ's cries for help were left without an appropriate response.

18.     A school is responsible for addressing harassment incidents about which it knows or reasonably should have known. When responding to harassment, a school must take immediate and appropriate action to investigate or otherwise determine what occurred. The specific steps in a school's investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the

Case 2:20-cv-01585-PP   Filed 10/16/20   Page 5 of 30   Document 1

size and administrative structure of the school, and other factors. In all cases, however, the inquiry should be prompt, thorough, and impartial.[1]

19.     If an investigation reveals that discriminatory harassment has occurred, a school must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring. These duties are a school's responsibility even if the misconduct also is covered by an anti-bullying policy, and regardless of whether a student has complained, asked the school to take action, or identified the harassment as a form of discrimination.[2]

20.     KMSD has been and continues to be incapable of and/or simply refuses to, recognize its duties and responsibilities under Title VI to end the harassment.

21.     In light of what educators, including those of KMSD, now understand about the long term emotional and even physical effects of this type of unrelenting harassment on adolescents, its negligence rises to and constitutes willful harm.

22.     Victims of bullies can sometimes become violent in their own right, in an ineffectual effort to express their frustration and humiliation. More often, they turn their rage inward, especially where their cries for help are not heard.

23.     For the families of these victims, there is nothing more tragic then seeing your child suffer. To give meaning to their child's experience , they feel compelled to tell their story. They feel a duty to do so in the hope the presentation of their story will prevent the same from happening to another family. In the course of this telling, these victims

---

[1] OCR in Ed Dear Colleague Letter, dated October 26, 2010.
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html
[2] *Id.*

benefit from a healing effect. The healing and empowering effect is even more pronounced when the story is told before a Federal Judge and in Federal Court, where the bright light and sanitizing effect of federal law and the Judge's gaze is focused on this important issue and the School District's failures.

<u>**WISCONSIN STATUTE §118.13, ET SEQ. AND
KMSD'S POLICIES ON RACIAL HARASSMENT**</u>

24.     Drafted in accordance with Wis. Stat. §118.13, KMSD's policy on racial harassment states, in pertinent part:

> 2. Discrimination and harassment can arise from a broad range of physical or verbal behavior which can include, but is not limited to, the following:
>
> **a. Physical or mental abuse;**
> **b Racial, ethnic or religious insults or slurs;**
>
> * * * * *
>
> 3. These activities are offensive and inappropriate in the school environment. This is a serious issue not just for the District, but also for each individual. **The District specifically prohibits discriminatory or harassing conduct, condoning such conduct by allowing it to go on, and prejudging harassment or discrimination complaints.** The District's rule prohibiting harassment applies to all students, staff members and volunteers whether at school or at school sponsored cocurricular, extracurricular or social functions. In particular, staff members should understand that they are "on duty" whenever they are with students, even if they are not at school or not at a school sponsored event.
>
> **4. Any student who engages in harassment or discrimination, or retaliates against another person because of a harassment/ discrimination report or participation in an investigation, is subject to immediate discipline, up to and including suspension and expulsion from the district.**

Page 7 of 30

5. If any student is aware of a possible violation of this rule, he or she should promptly report the matter.

*Emphasis added.* BoardDocs® Policy: 2303 DISCRIMINATION AND HARASSMENT PROHIBITED (2303)[3]

## <u>WISCONSIN STATUTE §118.46, ET SEQ. AND KMSD'S POLICIES ON BULLYING</u>

25. Crafted in accordance with Wis. Stat. §118.46, KMSD's Policies on Bullying

state, in pertinent part:

The district prohibits bullying and/or hazing. Bullying/hazing have a harmful social, physical, psychological and academic impact on bullies, victims and bystanders

The school district consistently and vigorously addresses bullying so that there is no disruption to the learning environment and learning process.

**Bullying is defined as the repeated intimidation of others by the real or threatened infliction of physical, verbal, written, electronically transmitted, or emotional abuse**, or through attacks on the property of another. It may include, but is not limited to, action such as **verbal taunts, spreading rumors, name-calling and put downs, extortion of money or possessions, and exclusion from peer groups within the school.** The behavior may be motivated by an actual or perceived distinguishing characteristic, such as, but not limited to: age; national origin; race; ethnicity; religion; gender; gender identity; sexual orientation; physical attributes; physical or mental ability or disability; and social, economic or family status.

Students who engage in any act of bullying at school, at a school function, or in connection to any activity sponsored by the district, or while going to or from school are subject to disciplinary action in accordance with district rules and regulations, **up to and including suspension or expulsion.**

\* \* \* \* \*

---

[3] https://go.boarddocs.com/wi/kmsd/Board.nsf/goto?open&id=853KW7099BC1

**The district will provide instruction intended to give students knowledge of effective means by which they may recognize, avoid, prevent and halt physically or psychologically intrusive or abusive situations** that may be harmful to them. Any student who feels that he or she is the victim of bullying or hazing should contact the building principal or follow the complaint procedure provided in the Kettle Moraine operating rules and regulations (see non-discrimination KMORR). The district shall maintain the confidentiality of the report and any related pupil records to the extent required by law.

**All school staff members and school officials who observe or become aware of acts of bullying are required to report these acts to the building principal or the Director of Student Services.**

**Any other person, including a student who is either a victim of the bullying or is aware of the bullying or any other concerned individual is encouraged to report the conduct to the building principal or the Director of Student Services**.

**Reports of bullying may be made verbally or in writing and may be made confidentially. All such reports, whether verbal or in writing, will be taken seriously and a clear account of the incident is to be documented.** A written record of the report, including all pertinent details, will be made by the recipient of the report.

Students and others are prohibited from retaliating against those who report incidents of bullying or hazing or who assist in an investigation. **Students and others who retaliate shall be subject to discipline.**

**Employees who participate in, allow, or knowingly fail to enforce this rule will be subject to disciplinary action.** Furthermore, as may be required by law, law enforcement officials shall be notified of bullying or hazing incidents.

*(Emphasis added.)* BoardDocs® Policy: 2301 BULLYING PROHIBITED (2301)[4]

---

[4] https://go.boarddocs.com/wi/kmsd/Board.nsf/goto?open&id=853KX4099DD5

**About Plaintiff SQ**

26.     In the late spring of 2017, Plaintiff SQ, a smart, funny, and cheerful African American minor, enrolled as a 6th grade transfer student of KM Middle School. KM Middle School is under the care and control of KMSD.

27.     In the Fall of 2019, Plaintiff enrolled as a 9th grade student at KM High School, which is also under the care and control of KMSD.

**Racial Harassment, Bullying, and Hostile Environment**

28.     From the time of her enrollment at KMSD, SQ has endured persistent, pervasive and increasingly severe acts of racial harassment and bullying, including cyberbullying involving the use of KMSD property or technology, at the hands of fellow students.

29.     This persistent and pervasive harassment, has taken many forms, from inappropriate questions such as "have you ever seen anyone get shot," to students using racial slurs in the hallway that were even overheard by teachers.

30.     The most serious response by any of KMSD teachers to the constant din of racial slurs and verbal attacks heard in the hallway was to occasionally yell "Hey," at the student using it.

31.     This lack of redress constitutes an inappropriate and ineffectual response to such comments, and violates KMSD's own policies.

32.     This persistent and pervasive harassment was overwhelming to 7th grade student SQ who, being new to the school district, was reluctant to speak out.

33.     On information and belief, this persistent and pervasive harassment has been known to be and continues to be commonplace at Defendant Kettle Moraine School District schools, including KM Middle School and KM High School.

34.     This persistent and pervasive harassment, and Defendants' obvious inability to stop it, constitutes a disruptive and hostile learning environment.

35.     This hostile environment has limited SQ's and other students' ability to fully participate and benefit in their education.

36.     In addition to the incidents mentioned above, in which teachers were aware and/or present for the violative acts, Plaintiff SQ continued to suffer seemingly unstoppable student-on-student discrimination and harassment.

37.     In compliance with Defendants' own policies, KM Middle School and/or KM High School, and KMSD were, in fact, notified about the following specific incidents with the following results:

**KMSD Middle School: Notice of Violative Acts and Failure to Adequately Respond**

38.     On or about October 16, 2017, an email was sent from minor student AB's email account racially attacking minor student and Plaintiff SQ. "AB," from whose email account the message came, denied sending the email. SQ made her teacher, teacher Ms. Ludeman (hereinafter "Ludeman") aware of the email, and Ludeman subsequently notified Vice Principal Laura Lloyd (hereinafter "Lloyd").  Ms. Lloyd called Ms. Crumble to inform her of the situation and inform her that an investigation was launched.

39.     In that investigation, KM Middle School authorities reviewed videotape footage from campus cameras and determined that AB was not the sender, but instead it

was his sister, student MB, who sent the email using AB's account. On information and belief, MB confessed when questioned. Plaintiff was advised by KM Middle School that they were not at liberty to disclose punishments. No further follow-up was provided.

40.    Despite this egregious attack, and the clear indication that students at KM Middle School were not aware of its policies on harassment, KM Middle School officials failed to provide its students guidance regarding non-tolerance of this type of behavior, and the behavior continued to be tolerated, to the detriment of Plaintiff SQ and others.

41.    During this incident, Plaintiff Ebony Crumble became aware of the situation at KM Middle School and became more involved in trying to keep check of the daily harassments and bullying suffered by its students of color, including SQ.

42.    On February 8, 2019, student NG wrote a racial slur directed to SQ on a prominently displayed whiteboard in the classroom at KM Middle School.

43.    In compliance with the KMSD's policies, Ms. Crumble immediately notified the school.

44.    In response, KM Middle School Principal Michael Comiskey, (hereinafter "Comiskey") instigated an investigation.

45.    At one point during his investigation, Comiskey entered the classroom where SQ was present, circled it, and then obviously and publicly announced that he had to speak with SQ about the incident.

46.    Comiskey then directed SQ out of her classroom and into the public hallway to get her account of the incident.

47. After SQ gave her account in the pubic hallway, Principal Comiskey excused NG's violative behavior explaining that NG hears the slurs in music and that is probably why he wrote it on the whiteboard.

48. Principal Comiskey justified a racial slur written on a white board in front of an entire class that was directed toward student SQ, a person of color, without any regard to his Title VI duty to protect SB from exactly this kind of racial attack.

49. Furthermore, his "investigation" denied SQ the right to privacy.

50. Despite this egregious racial attack, and the clear and obvious indication that students at KM Middle School were not aware of its policies on harassment, KM Middle School officials failed to issue consequences to the perpetrator of this violative behavior.

51. Despite the egregious racial attack, and the clear and obvious indication that students at KM Middle School were not aware of its policies on harassment, KM Middle school failed to offer its students corrective guidance regarding this type of behavior.

52. The behavior continued to be tolerated, and naturally, it recurred.

53. With no follow up to this incident, Ms. Crumble was compelled to request a meeting with Principal Comiskey. That meeting was later changed to include Kettle Moraine Superintendent Pat Deklotz (hereinafter "Deklotz"), and took place on or about February 14, 2019.

54. During this meeting, Principal Comiskey questioned Ms. Crumble why minor student SQ preferred to notify Ms. Crumble via email about the harassment, rather than make complaints on her own to school officials.

55.     According to its own policies and the policies set forth under Title VI, Ms. Crumble was well within the boundaries to bring to light the violative acts carried out against her minor daughter.

56.     Ms. Crumble, a person with no background in education, explained to Comiskey, a primary education institution subject to uphold the tenets of Title VI, that sometimes a child of color feels "safer" choosing her own advocate to address these issues in circumstances where racial harassment is prevalent.

57.     In the aforementioned meeting, Ms. Crumble continued to educate Comiskey in the ways in which his interactions with SQ amid his investigation had failed her, including making excuses for racial bullying. At the conclusion of this discussion, Ms. Crumble asked. Comiskey if he thought SQ viewed him as an advocate or a protector, to which Comiskey admitted "no."

58.     In this meeting Deklotz acknowledged that Defendants have known for quite some time "how bad it is and that the problems facing KMSD, KM Middle School and KM High School were due to a lack of diversity." She assured Ms. Crumble that the Defendants "are working on it".

59.     At this meeting, in an effort to placate Ms. Crumble, Deklotz assured her that the problems faced by children of color at KM Middle School would not be at KM High School because middle schoolers are too young to understand the consequences of their actions.

60.     Plaintiff Ebony Crumble expressed her disagreement with this contention and believed that early intervention was warranted.

Case 2:20-cv-01585-PP   Filed 10/16/20   Page 14 of 30   Document 1

61. In this meeting, Ms. Crumble pushed for clear consequences for specific violations of the policies and codes of conduct. She was advised by Deklotz that the children at the middle school level had no real understanding of the consequences of their actions and therefore the administration's focus is directed toward educating the students.

62. At this February 14, 2019 meeting, Superintendent Deklotz promised Ms. Crumble that she would put together a cultural advisory committee and asked if Ms. Crumble would be a part of it, to which she agreed.

63. In or around March 2019 teacher Mrs. Wroblewski turned off the classroom lights and student EH, in the presence of Mrs. Wroblewski, then commented "where did [SQ] go," causing the classroom to erupt with laughter to SQ's utter humiliation. Mrs. Wroblewski did not respond and the student was not addressed regarding the racial taunting of an 8th grader.

64. Despite the clear and obvious indication that students at KM Middle School were not aware of its policies on harassment, KM Middle School officials failed to issue consequences to the perpetrator of this violative behavior.

**KM High School: Notice of Violative Acts and Failure to Respond**

65. On or around October 19, 2019, student "CD" used a racial slur in the classroom in front of SQ and again later as CD entered the campus cafeteria where she was overheard by another student of color "EF".

66. Prior to this incident, in an off-campus and friendly setting, SQ overheard CD using the same slur, and took the opportunity to speak with her regarding the effect of

such a word on a person of color. At that time, she asked CD to kindly refrain from using it as it made people of color uncomfortable.

67.    Having already expressed to CD that the term is offensive, and then once again hearing CD use the term on campus, SQ and EF, two students of color, reported the incident to KM High School Vice Principal Bestor (hereinafter "Bestor").

68.    Bestor listened to the girls' account and advised he would follow up with EF & SQ.

69.    After approximately one day, Bestor advised EF & SQ that he was unable to issue a consequence to AB as there was no "proof."

70.    After enduring unchecked persistent and pervasive harassment and abuse at the hands of fellow students, SQ finally got the courage to stand up for herself. The result was that Bestor, a school official and employee of Defendants KMSD and/or KM High School, did not afford the students of color any benefit of credibility against a white student in a school that was admittedly problematic in terms of racial issues.

71.    Bestor and Defendants failed the SQ and EF. In fact, they failed all of the children of color in his care, and therefore the entire student body, and even the community as a whole.

72.    Ms. Crumble, after hearing no follow-up regarding this incident, once again met with Bestor to make her concerns known.

73.    On or around October 21, 2019, student GH (sister of CD mentioned above), and a Junior at KM High School was video recorded physically intimidating and threatening SQ and some of her 9th grade classmates over CD's use of and "right to use" a

racial slur. GH was upset that it had been reported. This recording was done on the school grounds of KM High School and was turned over to Bestor.

74. Plaintiff Ebony Crumble met with the parents of the sisters to discuss the appropriateness of a junior threatening violence against 9th graders. The mother of the sisters advised she would report GH to Bestor as she did not condone GH's behavior. GH was issued an undisclosed reprimand.

75. Despite the absolutely unacceptable intimidation and threat of violence and the racial nature of the underlying taunt, no students at KM High School were ever given guidance that would serve to educate them, curb the pervasive and persistent racial harassment nor improve the hostile learning environment.

76. On October 28, 2019 student IJ told SQ to "go back to the hood" and then posted on the social media platform Snapchat, a racial slur substituting the letter "g" with the letter "b." The Snapchat photo is taken from the hallway at Kettle Moraine High School, and on information and belief, was sent using the school's Wi-Fi.

77. Given the recent "cluster" of taunts, and their increased frequency and severity, Plaintiff Ebony Crumble decided to go directly to the Superintendent and requested a meeting with Deklotz and Principal Kaminski to discuss the increasingly hostile learning environment tolerated by KM High School.

78. At this meeting which took place on or about October 31, 2019, Plaintiff Ebony Crumble notified the school officials of the Snapchat incident, even providing the photo directly to Kaminski's iPhone. Kaminski assured that she would get to the bottom of things and issue "swift justice" to the offending student.

79.     At that time of the aforementioned meeting with Superintendent Klotz and Principal Kaminski, Ms. Crumble again expressed her frustrations with the failed ways KMSD and KM High School handles these known inadequacies.

80.     Once again, Ms. Crumble pushed for clear consequences to the students' behavior, however, she was told that if too much emphasis was placed on punishment then the appeal to empathy and toleration would be lost.

81.     There appeared to be no lengths to which KMSD and its agents would go to justify its inaction to the persistent and pervasive racial harassment directed at children of color in their care.

82.     Deklotz and Kaminiski advised that the direction they wanted to take was to educate students through "lessons of tolerance" that would be taught by voluntary participation during "advisory classes."

83.     Advisory class is a free period for students.

84.     As one might expect, these "lessons of tolerance" were treated as a joke by both students and faculty.

85.     At this same meeting, Ms. Crumble asked for an update about the cultural advisory committee promised  nearly a year before, and Deklotz informed Plaintiff that she was still working on "finding members who were willing to serve," and would advise when things progressed.

86.     Despite the egregious nature of the taunt, students were not educated or informed as to school policies against bullying or racial harassment, nor informed that the

reach of those policies extends to cyberbullying, whether nor not it was done on school grounds.

87.     As a result of the KMSD's failure to guide its students as to these policies and codes of conduct, the egregious act was later repeated.

88.     On or about November 8, 2019, Klotz issued an invitation to Plaintiff Ms. Crumble to participate in the first meeting of the newly formed Cultural Advisory Committee (hereinafter "CAC"), in which they along with others would hear from students past and present, and parents and other members of the community, in order to address the issues of race in KMSD schools.

89.     This first meeting took place on December 3, 2019. Ms. Crumble and Deklotz were both present at this initial meeting.

90.     On January 28, 2020 the CAC met again to discuss, among other things hallway behaviors and the impact of Advisory sessions, what consequences are given when racial slurs, inappropriate behaviors come to the attention of administration but discipline is confidential, and  students need to be believed when they report, not victimized.

91.     A third meeting of the CAC took place on February 24, 2020. These meetings were interrupted via the Covid Pandemic.

92.     Two seniors were on the panel of the CAC and repeatedly spoke to the racial disharmony they witnessed and endured during at KMSD.

93.     Dekoltz was present for all in-person meetings attended by Plaintiff Ebony Crumble.

94.     DeKlotz repeatedly acknowledged that the situation at KMSD was bad, and even reported that a family decided to pull their students from the school district due to the racial climate to which they were subjected.

95.     These meetings resulted in a lot of discussions about the problem and potential policy reviews, but nothing was actually or perceptibly done. Their house was on fire and they were counting hoses. As a result, the din of racial harassment continued to be prevalent in the hallways of KM High School.

96.     On September 3, 2020, KM High School student KL created a direct Snapchat of himself pictured with a racial attack as a headline on KM High School student MN's phone and sent it directly to Plaintiff SQ. This incident happened on campus and is believed to have used school resources (wifi).

97.     SQ shared the snap on her Snapchat story and it started to gain traction and backlash among their peers.

98.     As the snap began to go viral, Student KL, on his own accord, went to Bestor and disclosed what happened. However, on information and belief, he blamed it all on Student MN.

99.     On information and belief, Student KL urged Student MN to take full blame and responsibility for the snap.

100.    On information and belief, on or about September 4, 2020, Bestor issued a punishment to Student MN. It is unclear if he also issued one to KL at that time.

101.     Mr. Bestor telephoned Plaintiff Ebony Crumble to inform her of the situation and asked to speak with SQ so that he could make both offenders apologize as part of their punishment.

102.     The Snap was shared via social media and went viral.

103.     The Snapchat post incident was picked up by local media.

104.     The School Board, KMSD, and KM High School started receiving calls inquiring what actions the school were taking in response to this incident.

105.     On September 4, 2020, the matter was referred Waukesha County Sheriff's Department/Waukesha County DA, and both KL and MN were ultimately charged with disorderly conduct.

106.     On September 6, 2020, finally, after almost 3 years of tolerating all incidents of harassment and bullying described hereinabove, it only took a Snapchat photo to go viral for the KMSD to finally address with the student body and parents the racially hostile environment cultivated at KMSD.

107.     Only after substantial public pressure did Defendants issue a letter signed by Superintendent Deklotz on September 6, 2020, stating that once KM "became aware of an offensive and inappropriate racist social media post between students," that they "immediately began to investigate. Once all of the facts surrounding this matter were clear, the District took prompt action to address it and also referred the matter to law enforcement."

108.     Under the glare of public scrutiny, the school attempted to push the narrative that their actions were swift and just when in cold reality, as alleged in the paragraphs

hereinabove, harassment of this very kind and nature had been permitted to run rampant at KM Middle and High School.

109.     It took an onslaught of support from social media to get the school to do what they were all along bound by Title VI to do.

110.     Representatives of both KM Middle School and KM High School have admitted there is a problem.

111.     On information and belief, at least one family withdrew their 2 children from the KMSD as a result of the hostile learning environment tolerated or even fostered by Kettle Moraine.

112.     KMSD has had numerous opportunities, specifically over the past 3 years, to curb the persistent and pervasive and increasingly severe racial harassment and bullying experienced by Plaintiff SQ and other similarly situated students of KMSD, and witnessed and experienced by fellow students under the umbrella of the Kettle Moraine School District.

113.     Defendants' failures have resulted in the cultivating and nurturing of an extremely hostile learning environment.

114.     While often cloaked in non-transparency, the actions or inactions historically taken by any or all of the Kettle Moraine Defendants can no longer be considered reasonable or calculated to end the harassment, deter its recurrence, or eliminate the hostile environment.

Case 2:20-cv-01585-PP   Filed 10/16/20   Page 22 of 30   Document 1

115.     Kettle Moraine's negligence was so egregious that when the Snapchat photo went viral, and the press began to report on it, some students were so upset that this was happening at their school that they started a change.org petition.

116.     The Kettle Moraine Defendants have utterly failed its students, their parents, and the community at large.

117.     Such failures as noted hereinabove, have together and separately, contributed to violating SQ, and similarly situated students, of their civil rights pursuant to Title VI.

**The Toxic Effects of The Kettle Moraine Defendants' Failures**

118.     As a direct result of the Kettle Moraine Defendants' negligence and failures, SQ has suffered grievous harm.

119.     SQ recently began treating with a mental health professional to help to deal with the toxic build-up of racially charged traumas from her experiences at Kettle Moraine Middle School and Kettle Moraine High School.

120.     SQ has been diagnosed with severe Post Traumatic Stress Disorder and recurrent, moderate Major depressive disorder.

121.     It has recently come to light that SQ, as a way of dealing her yet undiagnosed PTSD and depression, began engaging in self-harm as early as 2018, when she was in 7th grade.

122.     Following counseling, SQ has confessed to taking the blades out of pencil sharpeners to use as cutting instruments, which she then used on concealed areas of her arms and legs.

123.     Further, on at least 3 occasions during the time she was in 7-9th grades, SQ attempted to end her life by ingesting medications that were not prescribed for her.

**CAUSES OF ACTION:**
**CIVIL RIGHTS, TITLE VI, 42 U.S.C. § 2000d ET SEQ.**

124.     Plaintiffs reallege and incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

125.     The Civil Rights Act of 1964 (Title VI), 42 U.S.C.2000d, *et seq*., prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving Federal financial assistance.

126.     As a publicly funded school, Kettle Moraine had a duty to uphold Title IV of the Civil Rights Act of 1964.

127.     The existence of a racially hostile environment that is created, encouraged, accepted, tolerated or left uncorrected, constitutes different treatment on the basis of race in violation of Title VI.

128.     A violation of Title VI may be found if racial harassment is severe, pervasive, or persistent so as to constitute a hostile or abusive educational environment.

129.     The Office for Civil Rights (OCR) in ED is responsible for enforcing Title VI as it applies to programs and activities funded by ED. OCR's responsibility to ensure that institutions that receive ED funds comply with Title VI is carried out through compliance enforcement.

130.     Given the large number of institutions under its jurisdiction, OCR is unable to investigate and review the policies and practices of all institutions receiving ED financial

assistance. Therefore, through a program of technical assistance, OCR provides guidance and support to recipient institutions to assist them in voluntarily complying with the law. In order to clarify a schools' obligations, OCR in ED published a *Dear Colleagues* letter on October 26, 2010, to address the obligations of educators to protect students from student-on-student bullying and harassment that is "sufficiently serious that it creates a hostile environment and such harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees."[5]

131.    Under Title VI, schools are obliged to address and prevent this harassment or bullying even if it may occur in electronic form.

132.    The *Dear Colleagues* letter states:

> The label used to describe an incident (*e.g.*, bullying, hazing, teasing) does not determine how a school is obligated to respond. Rather, the nature of the conduct itself must be assessed for civil rights implications. So, for example, if the abusive behavior is on the basis of race, color, national origin, sex, or disability, and creates a hostile environment, a school is obligated to respond in accordance with the applicable federal civil rights statutes and regulations enforced by OCR.
>
> When the behavior implicates the civil rights laws, school administrators should look beyond simply disciplining the perpetrators. **While disciplining the perpetrators is likely a necessary step, it often is insufficient. A school's responsibility is to eliminate the hostile environment created by the harassment, address its effects, and take steps to ensure that harassment does not recur.** Put differently, the unique effects of discriminatory

_____

[5] The Department's regulations implementing these statutes are in 34 C.F.R. parts 100, 104, and 106. Under these federal civil rights laws and regulations, students are protected from harassment by school employees, other students, and third parties. This guidance focuses on peer harassment, and articulates the legal standards that apply in administrative enforcement and in court cases where plaintiffs are seeking injunctive relief.

harassment may demand a different response than would other types of bullying. (*Emphasis added.*) [6]

133.     With reference to all paragraphs above, KMSD caused SQ, and others similarly situated students of color, to suffer a deprivation of rights pursuant to Title VI, and is therefore liable to Plaintiffs.

**CLAIMS PURSUANT TO 42 U.S.C. §1983 AND**
**TO THE 14th AMENDMENT TO THE U.S. CONSTITUTION**

134.     Petitioners incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

135.     42 U.S. Code § 1983 Civil action for deprivation of rights states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

136.     The acts and omissions of the Kettle Moraine Defendants specifically undermined and interfered with the rights and benefits of education owed to SQ and other similarly situated students, and Defendants are therefore liable under 42 U.S.C. §1983.

---

[6] Dear Colleagues Letter, Oct 26. 2010, P. 4-5.

## **RATIFICATION**

137.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

138.    The KM Defendants ratified the acts, omissions and customs of their respective personnel and staff.

139.    As a result, Defendants are responsible for the acts and omissions of staff persons who were otherwise responsible for protecting SQ.

## **PROXIMATE CAUSE**

140.    Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

141.    Each and every, all and singular of the foregoing acts and omissions, on the part of any or all of the Kettle Moraine Defendants, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## **RELEIF REQUESTED**
## **DAMAGES**

WHEREFORE, Plaintiff respectfully requests that this Court:

142.    As a direct and proximate result of the Kettle Moraine Defendants' conduct, SQ has suffered injuries and damages, for which she is entitled to recover[7] herein within the jurisdictional limits of this court, including but not limited to:

---

[7] 42 U.S. Code § 2000c–8.Personal suits for relief against discrimination in public education. Nothing in this subchapter shall affect adversely the right of any person to sue for or obtain relief in any court against discrimination in public education.

a. Loss of educational opportunities;
　　　　　b. Physical pain in the past;
　　　　　c. Medical expenses in the past;
　　　　　d. Mental anguish in the past;
　　　　　e. Mental anguish in the future;
　　　　　f. Physical impairment in the past; and
　　　　　g. Various out-of-pocket expenses incurred by SQ's family but for the acts and omissions of the District.

143.　　As a direct and proximate result of the Kettle Moraine Defendant's conduct, Plaintiff Ebony Crumble has suffered injuries and damages, for which she is entitled to recover herein within the jurisdictional limits of this court.

## ATTORNEY FEES

144.　　It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiffs are entitled to their costs and any reasonable attorney's fees in this action, pursuant to 42 U.S.C. §1988(b).

## PUNITIVE DAMAGES

145.　　Plaintiff incorporates by reference all the above-related paragraphs with the same force and effect as if herein set forth.

146.　　As noted above, the Kettle Moraine Defendants have a history of problems regarding discrimination based upon race and nationality.

147.　　The acts and omissions of KMSD, KM High School and KM Middle School shock the conscience, and thus satisfy criteria for punitive damages, as contemplated by §1983.

## EQUITABLE RELIEF

148.     Petitioners respectfully requests that the Court order the Kettle Moraine

School District to:

a. Adopt an anti-bullying and harassment program that is provided by a third-party, like the Anti-Defamation League or the Southern Poverty Law Center;

b. Adopt policies, procedures, and practices commensurate with the Dear Colleague Letter, dated October 26, 2010, from the United States Department of Education Office for Civil Rights;

c. That for the next three years KMSD provide for a school-safety coordinator for each Campus, so as to assure that the program is enacted comprehensively;

d. That KMSD retain a neutral third party to complete a bullying assessment for each campus and have that person or entity report back to the President of the School Board and Superintendent so KMSD may address any issues noted in the assessment;

e. That staff receive "Diversity training" by a third party to include information about race, nationality, gender and disability stereotypes;

f. That the school provide a marker in the school library, where books and other materials would be made available to students dealing with bullying harassment, and related emotional concerns and issues related to gender, race, and disability along with common stereotypes that accompany those subjects;

g. That Anti-bullying month be recognized by KMSD;

h. That the school district help facilitate the provision of counseling services for students deemed to be at risk;

i. That the School Board appoint a committee including interested members of the public to address the issues noted herein, report back to the Board and act accordingly; and

j. For any other relief the Court may see fit to prescribe.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY**

DATED at Milwaukee, Wisconsin on this 16th day of October, 2020.

Respectfully Submitted,

THE LAMARR FIRM, PLLC

BY:___/S/  *B'Ivory LaMarr*_____
Attorney B'Ivory LaMarr (WI BAR #1122469)
5100 Westheimer Rd
Suite 200
Houston, TX 77056
PHONE: 800.679.4600 ext. 700
 Email: blamarr@lamarrfirm.com

**Service Information:**

Kettle Moraine School District
Through its Superintendent:
Pat Deklotz
563 A.J. Allen Circle
Wales, WI 53183

Kettle Moraine High School
Through its Principal
Beth Kaminski
349 N. Oak Crest Drive
Wales, WI 53183

Kettle Moraine Middle School
Through its Principal
Michael Comiskey
301 E. Ottawa Avenue
Dousman, WI 53118