UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

S.Q., a minor, individually, by and through her
Parent EBONY CRUMBLE, and
EBONY CRUMBLE,

      Plaintiffs,

v.                                    Case No. 2:20-cv-1585

KETTLE MORAINE SCHOOL DISTRICT,

      Defendant.

## DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Kettle Moraine School District (the "District"), in response to Plaintiff's Proposed Findings of Fact [ECF 65] hereby states as follows:

1. KMSD maintained a specific policy to address discrimination and harassing conduct codified under their "Discrimination and Harassment Prohibited Policy also known KMORR 411, 512." [Exhibit A-KMSD Document Production-Discrimination and Harassment Prohibited Policy, KMSD 45.]

**RESPONSE:**      No dispute that the District maintains an anti-discrimination and harassment policy [ECF 44-2], but the record cited by Plaintiff is a summary of that policy that is contained in the Kettle Moraine Middle School Student Handbook from the 2017-2018 school year, not the actual policy. *See* [ECF 65-1, pp. 32-33].

2. The only discipline that Mr. Comiskey is aware of being administered was the February 8, 2019 incident involving the white board. [Dkt. 52, 77: 14-19]

**RESPONSE:** This proposed fact mischaracterizes the cited record. Mr. Comiskey's testimony speaks for itself and states that the only incident involving S.Q. that he was personally involved in was the incident on February 8, 2019. *See* Comiskey Dep. [ECF 52] 76:18-77:19. Mr. Comiskey did not testify that no other discipline was issued as to any of the other incidents, he just did not remember being involved with other incidents because he only worked at the middle school. [ECF 38, ¶ 16].

3. Deklotz agrees that the use of the word "nigger" is a racial slur that should be investigated in accordance with KMSD's discrimination/harassment policy. [Dkt. 53, 36:9-12]

**RESPONSE:** Ms. Deklotz testimony speaks for itself and states that she agrees that the word is a racial slur and that the District's discrimination/harassment policy would be applicable to a complaint over the use of that word. Deklotz Dep. [ECF 53] 35:2-3612.

4. KMSD's policy requires that informal investigations be requested by the complainant. [Exhibit A-KMSD Document Production-Discrimination and Harassment Prohibited Policy, KMSD 0015.]

**RESPONSE:** This proposed fact is immaterial and mischaracterizes the cited record. The record cited is a summary of the District's anti-discrimination and harassment policy contained in the Kettle Moraine Middle School student handbook for the 2016-2017 school year. [ECF 65-1, pp. 1-2]. The policy provides that if a complaint has been filed, the District "will allow a complainant the opportunity to resolve discrimination and harassment complaints on an informal basis, if the complainant asks to do so. Upon a complainant's request, the building principal will facilitate a meeting between the complainant and the alleged harasser/discriminator." *Id.* at p. 15. There is nothing in the policy language cited that relates to a requirement that "informal investigations" be requested by the complainant.

5.  Deklotz agrees that if the complainants did in-fact request an informal investigation then the building principal would put the complainant and the harasser and discriminator together to facilitate a meeting. [Dkt. 53, 104: 18-23]

**RESPONSE:**        This proposed fact is immaterial and mischaracterizes the cited record.  Ms. Deklotz testimony speaks for itself and states that if one filed a complaint and the complainant requested the opportunity to resolve the complaint on an informal basis, then the building principal would facilitate a meeting between the complainant and the harasser/discriminator per the policy.  *See* Deklotz Dep. 103:12-105:14.  This informal resolution is not part of any type of request for an "informal investigation" as Plaintiff claims.

6.  S.Q. never requesting for her allegations to be investigated on an informal basis yet, her claims were taken as an informal investigation not a formal investigation. [Dkt. 53, 102:23-103:7]

**RESPONSE:**        This proposed fact is immaterial and mischaracterizes the cited record.  Ms. Deklotz testimony speaks for itself and states that Ms. Crumble did not ask the District to investigate any of the incidents.   Ms. Deklotz stated that she believes that the District investigated the complaints whenever they became aware of them.  Deklotz Dep. 103:1-7.  Ms. Deklotz identified that the District conducts investigations regardless of whether a formal complaint is filed per the policy.  Deklotz Dep. 103:1-18; [ECF 44-2].  An informal investigation is different than a request to resolve a complaint on an informal basis.  *See id.*

7.  Deklotz admits that the allegations in this lawsuit were not brought to the director of pupil services because they were handled through an informal process. [Dkt. 53, 136:21-137:4]

**RESPONSE:**        This proposed fact is immaterial and mischaracterizes the cited record.  Ms. Deklotz testimony speaks for itself and explains that a formal complaint was never filed that would have triggered the procedure involving the Director of Pupil Services.  Deklotz

3

Dep. 136:21-137:23. As explained above, an informal investigation or informal process is not the same thing as resolution of a claim of harassment on "an informal basis".

8. There are only (4) people authorized by the District to investigate claims of discrimination and harassment which is the (1) Director of Pupil Services or (2) their Designee and (3) appointed investigative team or (4) an independent Consultants. [Exhibit A-KMSD Document Production-Discrimination and Harassment Prohibited Policy, KMSD 46.]

**RESPONSE:** This proposed fact is immaterial and mischaracterizes the District's policy and procedure. The record cited by Plaintiff is a summary of the anti-discrimination and harassment policy that is contained in the Kettle Moraine Middle School Student Handbook from the 2017-2018 school year, not the actual policy. The policy explains that if a person initiated a formal complaint process by submitting a written complaint to the director of pupil services, then an investigation will be conducted pursuant to the designated procedure. *See* [ECF 65-1, pp. 45-46]; [ECF 44-2]. The policy does not provide that only four people are authorized to investigate claims of discrimination and harassment in the District. If a "designee" and an "appointed team" can investigate complaints, then it is not limited to only four distinct people.

9. Dekoltz admitted the formal complaint process was never used by the District with S.Q.'s seven incidents and admits that the District actions were not working after the seventh incident. [Dkt. 53, 139:16-21, Exhibit C-KMSD Parent letter]

**RESPONSE:** This proposed fact mischaracterizes the cited record. Ms. Deklotz testimony speaks for itself and explains that the formal complaint process was never utilized as no formal complaint was ever filed. Deklotz Dep. 138:5-141:9. Furthermore, the statement that "the District actions were not working after the seventh incident" is not supported by the cited record. This September 6, 2020 letter was a letter to parents after the Snapchat incident. It does not claim

4

that the District's past actions related to Plaintiff had not worked. It addressed a larger issue of the climate within the district in general. *See* [ECF 65-3].

10. Deklotz admits that it is important to gather all the facts to do an investigation and that the District policy requires a written complaint form or a statement on a student's paper. Dkt. 53, 156:8-157:3]

      **RESPONSE:**      This proposed fact is immaterial. No dispute that Ms. Deklotz stated that: "[W]e do our best to gather all the facts available." Deklotz Dep. 156:12-13. She did not state that the "District policy requires a written complaint form or a statement on a student's paper." Deklotz Dep. 156:8-157:17. The testimony only states that "administrators frequently ask victims to write out their statement of what happened." Deklotz Dep. 156:21-23.

11. S.Q. never completed or was asked to complete to a written complaint form or prepare a statement on paper to any of her seven allegations in this case. [S.Q. Declaration]

      **RESPONSE:**      This proposed fact is immaterial. No dispute that S.Q. made the statement that she was not asked to complete a written complaint form or prepare a statement, but this fact is immaterial to summary judgment and there is no requirement in the District's policy to ask a victim to fill out a complaint form or written statement. [ECF 44-2].

12. Bestor admits that staff members failed to report possible violations in accordance with their duty to follow the formal complaint process as it relates to the three incidents involving S.Q. Quinn. [Dkt. 50, 81: 1-10]

      **RESPONSE:**      This proposed fact mischaracterizes the cited record. Mr. Bestor stated that there was no formal complaint submitted with regards to the three incidents he was involved with. Bestor Dep. [ECF 50] 78:4-81:10. That testimony does not support the statement that "staff members failed to report possible violations."

5

13. KMSD reported "0" discrimination and harassment actions for the year 2019-2020, submitted on February 20, 2020 by Charles Wiza. [Exhibit A- KMSD Document Production – 00505]

  **RESPONSE:**   This proposed fact is immaterial. No dispute regarding the contents of the cited from. This is a report of formal complaints.

14. Copies of all suspension notification letters are to be placed in the student's file [Exhibit A-KMSD Document Production-Discrimination and Harassment Prohibited Policy, KMSC 0025]

  **RESPONSE:**   This proposed fact is immaterial. No dispute that 2016-2017 Kettle Moraine Middle School student handbook states under the section on Student Code of Conduct & Expectations that: "Copies of all suspension notification letters are placed in the student's file." [ECF 65-1, pp. 24-25].

15. Bestor agrees that his handling of matters is separate and apart from what's handled on the district level. [Dkt. 50, 67:15-18]

  **RESPONSE:**   This proposed fact is immaterial. This proposed fact is so vague and out of context that it is meaningless. Mr. Bestor's testimony indicated that his investigation of a rule violation as a building principal is a separate process from the District level investigation process involving the director of pupil services that would be triggered by the filing of a formal complaint under the anti-harassment and discrimination policy. *See* Bestor Dep. 64:6-68:1.

16. Mr. Comiskey agrees that a student emailing S.Q. the racial slur "nigger" would be a violation of the District's policy pertaining to discrimination, harassment, and bullying. [Dkt. 52, 64:19-65:5]

6

**RESPONSE:** No dispute that Mr. Comiskey agreed that a student emailing S.Q. a racial slur would be a violation of the District's anti-harassment and discrimination and bullying policies.

17. Lloyd's investigation did not reveal why the student used the word nigger and does not recall if she ever asked the student why they used the term. [Dkt. 51, 37:20-25]

**RESPONSE:** No dispute that Ms. Lloyd could not say why the student used a racial slur in October 2017 and when asked if she asked the student why she used the word, she responded "I don't recall, but I'm sure I did." Lloyd Dep. [ECF 51] 37:20-25. This fact is also immaterial to summary judgment.

18. Kettle Moraine is a recipient of federal funding. [Exhibit B-Kettle Moraine Financial Report 2, 15-17]

**RESPONSE:** Disputed that Plaintiff has carried her burden on this issue. The cited exhibit does not directly identify federal funds received by the District. Pass-through grants from the state may constitute receipt of federal funds if they are traceable back to the federal source and the expenditure of those funds at the local level relates to the "structure, operation, and purpose" of the original federal grant. *United States v. Atalig*, No. 1:18-cr-00013, 2020 U.S. Dist. LEXIS 159450, at *14 (D. N. Mar. I. Aug. 31, 2020).

19. Lloyd categorized the complaint as racial harassment and agreed that such complaint should follow the district policy. [Dkt. 51, 39:22-40:7 49:8-16]

**RESPONSE:** This proposed fact is vague and does not identify what "complaint" it refers to. The cited testimony indicates that Ms. Lloyd identified the October 2017 email incident as racial harassment. Any statements that such a complaint should follow the "district policy" is not supported by the cited record. Ms. Lloyd's testimony was that there is a general obligation

7

when there is a complaint involving racial harassment to document that the harassment was race based.  Lloyd Dep. 40:8-13.

20. Lloyd determined that S.Q. did not have any injury because she was unaware of a physical injury and does not recall asking if she was injured. [Dkt. 51, 40:19-41:7]

**RESPONSE:**        No dispute that Ms. Lloyd populated the injury box with "no injury" in the behavioral detail report related to the October 2017 incident [ECF 42-2] because S.Q. did not sustain any physical injury and stated that "if she was injured, I would have put down what the injury was." Lloyd Dep. 40:119-41:10.  This fact is also immaterial to summary judgment.

21. Lloyd claims that the disciplinary action was determined by considering the extent of any injury suffered by S.Q. when making the decision. [Dkt. 51, 41:20-23]

**RESPONSE:**        This proposed fact mischaracterizes the cited record.  Ms. Lloyd testified that whether there is an injury to a victim can be considered in issuing discipline and that the discipline issued to the student in this situation was "in part" determined by the fact that there was no physical injury.  Lloyd Dep. 41:17-43:1.

22. Part of the discipline was for the perpetrator to offer an apology to S.Q. but Lloyd cannot confirm that apology actually occurred. [Dkt. 51, 47:5-13]

**RESPONSE:**        No dispute that part of the discipline was for the perpetrator to apologize to S.Q. and Ms. Lloyd does not have a recollection of the apology taking place, although Ms. Crumble stated that the student did apologize.  Crumble Dep. [ECF 49] 24:6-21.

23. KMSD allegedly issued the following Behavior Detail Reports in response to S.Q. complaints [Exhibit A-KMSD Document Production-Behavior Detail Reports, KMSD 447, 464, 466, 468, 494, 495]

8

**RESPONSE:** No dispute that the District issued Behavior Detail Reports in response to the incidents that were brought to the District's attention that resulted in discipline. *See* [ECF 42-2; 43-3; 45-6; 46-3; 46-5]. There is nothing in the record to support the statement "allegedly" as these Behavioral Detail Reports have been properly authenticated by their respective custodian and Plaintiff does not challenge the authentication.

24. Lloyd admits that the October 17, 2017 incident was not simply an allegation it was confirmed to have actually occurred because the perpetrator admitted it. [Dkt. 51, 49:20-50:1]

**RESPONSE:** No dispute that Ms. Lloyd confirmed that the October 17, 2017 incident occurred because the perpetrator admitted to sending the email.

25. The complainant did not ask for this complaint to be resolved in an informal basis, the school took it upon themselves to resolve it on an informal basis. [Dkt. 51, 55:3-12]

**RESPONSE:** This proposed fact is a mischaracterization of the record. The cited record states that the formal complaint process was not requested and that the District investigated at the building level. Lloyd Dep. 54:22-55:16. This proposed fact is also immaterial to summary judgment.

26. Lloyd does not recall whether S.Q. was asked whether the incident was resolved to her satisfaction. [Dkt. 51, 59:7-10]

**RESPONSE:** No dispute that Ms. Lloyd does not recall whether S.Q. was asked whether the incident was resolved to her satisfaction but there is no legal requirement to do so, and whether Ms. Lloyd can recall doing so is immaterial to summary judgment.

27. Lloyd acknowledges that formal complaints are to only go to Kristi Foy or Charlie Wiza or their designee. [Dkt. 51, 62:16-20]

**RESPONSE:** This proposed fact is immaterial. No dispute that if someone initiates a formal complaint pursuant to the District's policy, they need to submit a complaint to the Director of Student Services/Title IX Coordinator or his/her designee. [ECF 44-2].

28. Complaint forms are to be sent to the district in order to impute notice to the district. [Dkt. 51, 64:1-16]

**RESPONSE:** This proposed fact is immaterial and mischaracterizes the cited record. Ms. Lloyd's testimony was that to initiate the formal complaint procedure a person would need to send a complaint to the Director of Pupil Services and that this would impute notice to the District. [Lloyd Dep. 64:1-16].

29. Bruce Levenberg opined that Kettle Moraine School District acts and omissions were unreasonable and in contradiction to its policy. [Exhibit D-Levenberg Expert Affidavit, 21]

**RESPONSE:** The District objects to this proposed fact as this is a conclusion that is only supported by an inadmissible expert opinion. The citation to Paragraph 21 also does not support the claim.

30. Lloyd admitted that step 3 and step 4 was not followed in accordance of the district policy. [Dkt. 51, 67:8-15]

**RESPONSE:** This proposed fact is immaterial and mischaracterizes the cited record. Ms. Lloyd's testimony was that the formal complaint investigation procedure did not occur because no formal complaint was submitted to the District. Lloyd Dep. 66:1-67:23.

31. Despite her name appearing on the Disciplinary report, Lloyd contends that she did not fill out the form. [Dkt. 51, 70:17-23]

**RESPONSE:** This proposed fact is not supported by the cited record and does not identify which incident it refers to. The Behavioral Detail Report that was discussed in the cited

10

portion of Ms. Lloyd's deposition is in relation to the February 2019 incident involving the writing of a racial slur on a white board. *See* [ECF 43-3]; Lloyd Dep. 68:3-71. Ms. Lloyd's name is listed on the Behavioral Detail Report but it was submitted by Michael Comiskey who authenticated it as an exhibit and Plaintiff does not challenge the authentication. *Id.*

32. Despite Laura Lloyd's name being identified as to disciplining a student she contends she does not recall doing so. [Dkt. 51, 71:16-18]

**RESPONSE:** This proposed fact is not supported by the cited record and whether she or Mr. Comiskey issued the discipline is immaterial to summary judgment.

33. Lloyd acknowledges that her name being associated with the resolution of this case is inaccurate and did not participate in the in-school suspension decision. [Dkt. 51, 72:13-16, 17-21]

**RESPONSE:** This proposed fact is vague and not supported by the cited record. Ms. Lloyd stated that she assisted in the investigation of the February 2019 incident but was not involved in the disciplinary decision. Lloyd Dep. 72:10-73:22.

34. Despite Laura Lloyd's name being listed on the disciplinary report, Lloyd contends she also did no initiate a parent phone call nor issue a suspension. [Dkt 51, 74: 10-18]

**RESPONSE:** No dispute. Mr. Comiskey initiated the discipline in this instance rather than Ms. Lloyd. *See* [ECF 43-3]; Comiskey Dep. 79:18-80:10.

35. Lloyd does not know if a discipline was issued at all. [Dkt. 51, 76:17-19]

**RESPONSE:** No dispute that Ms. Lloyd did not know if the discipline was issued, but the Behavior Detail Report [ECF 43-3], authenticated by Mr. Comiskey, his testimony (Comiskey Dep. 79:18-80:10), and the offending student's attendance record [ECF 44-7], all conclusively establish that the student was disciplined.

36. Lloyd does not have knowledge of a form that would be used by a victim to specify what took place in their own words. [Dkt. 51, 77:21-78:3]

**RESPONSE:** No dispute that Ms. Lloyd did not have knowledge about a form to be used for allegations of harassment or bullying but this fact is immaterial to summary judgment.

37. Lloyd admits that she has never provided a discrimination/bullying harassment complaint form to a victim of any incident of which she investigated. [Dkt. 51, 79:2-4]

**RESPONSE:** No dispute that Ms. Lloyd testified that she has never provided a form to the victim of an allegations of harassment, but this fact is immaterial to summary judgment.

38. Mr. Comiskey agrees that a student who is alleged to use the racial slur "nigger" would violate the Kettle Moraine district policy as it relates to discrimination, harassment, and bullying. [Dkt. 52, 63:25-64-17]

**RESPONSE:** No dispute that Mr. Comiskey stated that a student who used a racial slur would be in violation of the District's anti-discrimination and harassment and bullying policies. However, this proposed fact is immaterial.

39. Mr. Comiskey admits that he explained to S.Q. that the word "nigger" is commonly used in music. [Dkt. 52, 68:18-22]

**RESPONSE:** No dispute that Mr. Comiskey testified that the "N" word is "obviously a very complicated word" and that he did discuss with S.Q. that this word is "commonly used in music" but this fact is immaterial to summary judgment.

40. Mr. Comiskey admits that after issuing a discipline to the student, he does not recall having any conversations with S.Q. thereafter. [Dkt. 52, 79:17-25]

**RESPONSE:** No dispute that Mr. Comiskey did not recall having any conversation with S.Q. after suspending the offending student, but there is no legal requirement for him to have done so. This fact is immaterial to summary judgment.

41. Mr. Comiskey cannot recall the purpose of discussing with S.Q. the fact that the word nigger is used in music. [Dkt. 52, 82:1-24]

**RESPONSE:** This proposed fact is not supported by the cited record. Mr. Comiskey stated that he discussed the fact that the "N" word is used in music because he "was just trying to understand if she had any idea about the context of the student's use of the word and in that context – in that inquiry I was asking about whether there was something related to music that perhaps, she might infer, et cetera, about his use of the word." Comiskey Dep. 82:5-13. This fact is also immaterial to summary judgment.

42. Mr. Comiskey cannot recall how he came to determine that a one-day suspension was a sufficient discipline. [Dkt. 52, 85:14-19]

**RESPONSE:** No dispute that Mr. Comiskey did not have a specific recollection of how he determined that a one-day suspension was appropriate but that generally he talks about each situation and judges the context of the event. Comiskey Dep. 80:9-20. This fact is also immaterial to summary judgment.

43. Comiskey admits that when an incident like this occurs in a teacher's classroom they often cycle back and discuss how the incident had been resolved but does not have recollection of doing so in the whiteboard incident. [Dkt. 52, 85:25-86:9]

**RESPONSE:** No dispute that Mr. Comiskey did not have a specific recollection of whether he discussed this incident with the classroom teacher, but this fact is immaterial to summary judgment.

13

44. Comiskey has no recollection of speaking with the offending student's parents in response to the whiteboard incident. [Dkt. 52, 86:10-19]

**RESPONSE:** This fact is not supported by the cited record. Mr. Comiskey testified that it was highly unlikely that he did not talk to the student's parents. Comiskey Dep. 86:10-87:1. The Behavior Detail Report documents that the parents were called. [ECF 43-3].

45. Comiskey does not have knowledge or any evidence that the offending student actually served the one-day suspension. [Dkt 52, 88:5-19, 88:23-89:1]

**RESPONSE:** This fact is not supported by the cited record. Mr. Comiskey merely stated that he did not have any documents in his possession to independently prove that the student served the suspension. Comiskey Dep. 88:5-22. He stated that the suspension information would have been in the Infinite Campus system. *Id.* Also, the student's attendance records show that he served the suspension. [ECF 44-7].

46. Comiskey cannot recall if he ever inquired as to whether S.Q. needed support services as a result of any harms from this incident and does not have any evidence that support was provided. [Dkt. 52, 90:3-18]

**RESPONSE:** No dispute that Mr. Comiskey could not recall whether he inquired if S.Q. needed support services and that such information would not necessarily have been recorded. Comiskey Dep. 90:3-14.

47. Despite knowing of its existence, Comiskey does not recall reviewing the counseling log to understand harms that S.Q. had experienced in the past. [Dkt. 52, 95:4-11]

**RESPONSE:** No dispute that Mr. Comiskey could not remember if he looked into any potential counseling logs related to S.Q. Comiskey Dep. 95:4-11. This fact is also immaterial to summary judgment.

14

48. The counseling log that was available to Comiskey demonstrates a propensity for S.Q. to self-harm with the most recent entry being on November 30, 2018. [Dkt. 52, 100:14-101:9]

**RESPONSE:** No dispute that the counseling log indicated that Plaintiff had engaged in self-harm. This proposed fact is immaterial to summary judgment. Plaintiff does not link the self-harm to racial harassment and ignores that Plaintiff's self-harm, depression, and suicide attempts pre-dated her claims of racial harassment. Levenberg Dep. [ECF 58] 28:8-16.

49. Comiskey admits that to determine a discipline, the injury or harm is a factor in making that determination and looking at the counseling log would have been helpful in the determination of instituting a discipline. [Dkt. 52, 103:22-104:7]

**RESPONSE:** No dispute that Mr. Comiskey stated that looking at S.Q.'s counseling log at the time of issuing discipline would have been helpful (Comiskey Dep. 103:19-104:16), but this fact is immaterial to summary judgment.

50. Ms. Wroblewski has no recollection of playing the Bill Nye the Science Guy video when S.Q. was a student in her class. [Dkt 47, 26:23-24:1]

**RESPONSE:** No dispute that Ms. Wroblewski had no recollection of playing a Bill Nye the Science Guy video when S.Q. was a student in her class in March 2019. Wroblewski Dep. [ECF 47] 26:2-27:1. This fact is immaterial to summary judgment.

51. Ms. Wroblewski has no recollection of turning off the lights in the classroom during the year of 2019 when S.Q. was a student. [Dkt. 47, 27:2-5]

**RESPONSE:** No dispute as to Ms. Wroblewski's testimony but this fact is immaterial to summary judgment.

52. Ms. Wroblewski does not find S.Q. to be untruthful and does not have any reason to disbelieve assertions made by S.Q. [Dkt. 47, 27:17-28:4]

15

**RESPONSE:** No dispute as to Ms. Wroblewski's testimony but this fact is immaterial to summary judgment.

53. Ms. Wroblewski admits that when she is made aware of an incident of bullying or harassment that she would take the liberty of investigating the matter herself and provide the information related to her investigation to administration. [Dkt. 47, 28:25-29:5]

**RESPONSE:** This fact is a mischaracterization of the cited record and Ms. Wroblewski's testimony speaks for itself. She testified to what she was trained to do when made aware of an incident of bullying or harassment. Wroblewski Dep. 28:17-29:5. This fact is also immaterial to summary judgment.

54. Ms. Wroblewski has never been contacted by anyone in relation to allegations involving the lights being turned off and not being able to find S.Q.. [Dkt. 47, 31:1-5]

**RESPONSE:** No dispute that Ms. Wroblewski was never aware of a situation where a student made the "Where is Tink" comment and was not made aware of this allegation until this lawsuit was filed. Wroblewski Dep. 29:24-33:8.

55. Ms. Wroblewski was never made aware of a whiteboard incident aimed at S.Q. occurring one month before the incident where lights were turned off. [Dkt. 47, 33:14-19]

**RESPONSE:** No dispute that Ms. Wroblewski testified that she was not made aware of the incident involving the writing of a racial slur on a whiteboard. Wroblewski Dep. 33:9-19.

56. Deklotz says that the District could not respond to specific instances of incidents because she did not view [Cultural Advisory Meetings] as a reporting time because it was too delayed for action to be taken against a specific incident. [Dkt. 53, 21:6-15]

16

**RESPONSE:** This proposed fact is a mischaracterization of the cited record. Ms. Deklotz testified that the District would generally not be able to investigate a claim of harassment if the report was delayed. Deklotz Dep. 20:13-21:23. This is consistent with the fact that the incident with the lights being turned off occurred in middle school and was brought to the District's attention "a year or two" later in high school. Crumble Dep. 88:12-23.

57. Deklotz does not recall making specific notes of incidents that were reported during those meetings. [Dkt. 53, 22:15-18]

**RESPONSE:** No dispute that Ms. Deklotz did not recall making specific notes regarding any specific incidents, but this fact is immaterial to summary judgment.

58. Deklotz was aware of the allegation involving "Where is S.Q. and Where is Tink involving the lights being turned off but not certain how she became aware of the allegation. [Dkt. 53, 26:1-6]

**RESPONSE:** No dispute that Ms. Deklotz stated that she was not sure when she was made aware of the alleged incident involving the statement "Where is Tink" but Ms. Crumble testified that she reported it to the District one to two years later. Crumble Dep. 88:12-23.

59. Deklotz agrees that this incident, if came in a timely manner, should be investigated under the discrimination/harassment policy. [Dkt. 53, 37:14-38:8]

**RESPONSE:** No dispute that Ms. Deklotz stated that if this incident was reported in a timely manner, then the District would investigate it (Deklotz Dep. 38:2-16), but this fact is immaterial because this incident was not timely reported.

60. Deklotz admits that the District has a duty to investigate claims regardless to when those claims are brought to the District that involves discrimination and harassment [Dkt. 53, 40:5-15]

**RESPONSE:** This proposed fact mischaracterizes the cited record. The question of whether a duty exists is a legal conclusion, not a factual question, and this question was objected to at the deposition as calling for a legal conclusion. Deklotz Dep. 40:5-15. Ms. Deklotz also explained that the District cannot effectively investigate an incident that is not brought to the District's attention within a period of time that would have a bearing on that behavior and if it comes months or years after the fact it is not something that can be easily investigation. Deklotz Dep. 38:2-16.

61. A student name Abagail used the word nigger in the hallway in response to a situation that caused division between the girls involving someone being hit a football game. [Dkt 50, 20:16-21:1]

**RESPONSE:** This proposed fact is not supported by the cited record. Mr. Bestor testified that it was alleged that a student used the "N" word in a high school hallway. Bestor Dep. 20:16-21:4. Whether the student used the word is not material to summary judgment. Whether the District investigated the incident is material, and it is undisputed that Mr. Bestor investigated it.

62. Bestor was contacted by three (3) students about the use of the word nigger by Student A. [Dkt. 50, 21:8-13]

**RESPONSE:** No dispute that S.Q. and two other students alleged that the student used the "N" word in their presence. Bestor Dep. 20:16-21:13.

63. Bestor did not look into this incident until after receiving an email from Carmen's mother. [Dkt. 50, 22:4-10]

**RESPONSE:** This proposed fact is not supported by the cited record. Mr. Bestor testified that he did not remember if he received the email first or if the girls came to him first, but

they were close in time and "obviously whatever came first, I investigated starting right away with the girls telling me or the email." Bestor Dep. 22:15-22.

64. The physical threat by "Student A" sister, "Student E", occurred on a different day than the word "nigger" was used by "Student A." [Dkt. 50, 24:11-15]

**RESPONSE:** No dispute that these alleged incidents took place on different days but the claim that the student used the "N" word is an allegation, not a conclusive fact. Bestor Dep. 21:14-24.

65. The discipline that was issued was only to Student E. [Dkt. 50:24:20-24]

**RESPONSE:** No dispute that the student who engaged in physically threatening conduct was disciplined.

66. There was no disciplined issued for "Student A's" use of the word nigger. [Dkt. 50, 33:20-24]

**RESPONSE:** No dispute that there was no discipline issued to Student A because Mr. Bestor was not able to substantiate that she had used that word. Bestor Dep. 33:20-34:18; 48:9-15.

67. Bestor claimed he did not have sufficient evidence to issue a consequence with a clear determination that the N word was used and could not issue a consequence. [Dkt. 50, 34:7-15]

**RESPONSE:** No dispute that Mr. Bestor stated that he did not have sufficient evidence to issue a consequence without a clear determination that the "N" word was used.

68. Bestor cannot recall whether he updated the complainants of the results of his investigation. [Dkt. 50, 34:7-18]

**RESPONSE:** This proposed fact is incomplete and ambiguous based on the cited record. Mr. Bestor testified that: "I don't recall exactly. I do specifically remember calling [the

19

student's] mother and having that difficult conversation that during my investigation I looked into everything, but I did not have sufficient evidence to issue a consequence." Bestor Dep. 34:7-12.

69. Bestor failed to issue a discipline despite being approached by 3 students whom all alleged the use of the word nigger by Student A and had no reason to believe that the three students were not credible or untruthful. [Dkt 50, 34:20-35:9]

**RESPONSE:** This proposed fact is a mischaracterization of the cited record. Mr. Bestor did not "fail" to issue a discipline. He indicated that it was a "he said, she said" situation and he could not determine who was telling the truth as the student denied using the term. Bestor Dep. 33:20-34:18; 48:9-15; 51:24-52:7.

70. Bestor further failed to even make a written documentation of his investigation by filing a behavior detail report involving allegations of Student A's use of the word nigger which he believes to be offensive and the district to have a strong stance against. [Dkt. 50, 35:10-19]

**RESPONSE:** This statement is compound and mischaracterizes the record. No dispute that Mr. Bestor did not file a behavior detail report. No discipline was issued so there was nothing to report on a behavior detail report. Mr. Bestor did document his investigation in writing. [ECF 46-1].

71. Bestor admits that investigations with the use of the word "nigger" should be investigated in accordance with the district policy. [Dkt. 50, 35:20-36:3]

**RESPONSE:** This proposed fact is vague and mischaracterizes the cited record. Mr. Bestor stated that the District takes a strong stance against the use of racially charged language which is in accordance with its anti-discrimination and harassment policy and should be investigated. Bestor Dep. 35:17-36:3.

72. Deklotz acknowledges that two different incidents were brought to her attention, one being called a nigger in the cafeteria and physical intimidation by the student's sister resulting in two different investigations, one by the associate principal and one by Ms. Kaminski. [Dkt. 53, 28:2-16]

**RESPONSE:** No dispute that Ms. Deklotz testified that she was made aware of the situation where a student engaged in physically intimidating behavior towards Plaintiff and others and the allegation that a student used the "N" word, not that it was directed at Plaintiff. She testified that both were brought to her attention and that her "response was to ensure that it was being thoroughly investigated and that consequences would be meted out appropriately if the allegations were proven true." Deklotz Dep. 28:2-29:1

73. Elizabeth admitted to making threatening comments towards S.Q. and the other girls. [Dkt. 50, 25:19-22]

**RESPONSE:** No dispute that the student admitted to making the threatening comments, but the threatening behavior was not targeted directly at S.Q. Bestor Dep. 15:10-16:5.

74. Bestor's investigation revealed his belief that as some point both [Student E and Student A] used the word nigger. [Dkt. 50, 26:7-16]

**RESPONSE:** This proposed fact mischaracterizes the cited record. Mr. Bestor's investigation did not reveal a belief that the students used the "N" word. Rather he stated that: "I know that one of the two girls was alleged to use the 'N' word." Bestor Dep. 26:9-13.

75. Bestor admits that "Student E's" comments would constitute harassment based off the discrimination and harassment prohibited policy. [Dkt. 50, 26:23-27:2]

**RESPONSE:** No dispute that Mr. Bestor stated that the use of threatening language would constitute harassment based on the District's anti-harassment policy. Bestor Dep. 26:17-27:2. There is nothing to tie the threatening comment to race.

76. Bestor concluded there was no injury to S.Q. because he did not see a physical injury. [Dkt. 50, 27:3-8]

**RESPONSE:** This proposed fact mischaracterizes the cited record. Mr. Bestor stated that he indicated no injury on the Behavior Detail Report [ECF 46-3] because there was no physical injury and that psychological injuries are not usually part of what is required on the report. Bestor Dep. 27:3-14.

77. Bestor admits that through his training he's come to understand that phycological, emotional, academic, and other injuries can result from discriminatory and harassing conduct. [Dkt. 50, 27:24-28:6]

**RESPONSE:** No dispute as to Mr. Bestor's testimony but this proposed fact is immaterial to summary judgment.

78. Bestor confirms that he did not raise this issue to the District because he usually takes things at the building level and investigate it themselves. [Dkt. 50, 29:23-30:6]

**RESPONSE:** This proposed fact mischaracterizes the cited record. Mr. Bestor was asked if he investigated this incident by himself. Bestor Dep. 28:13-22. He testified that he may have discussed it with others, including the principal. Bestor Dep. 28:15-25. He was then asked if he talked to others or raised it to the District, and he responded that is "not" standard procedure and "[w]e usually take things at a building level. We investigate. We try to find it out as quickly as possible, come to a reasonable conclusion as quickly as possible." Bestor Dep. 29:23-30:6.

79. Deklotz admits that this incident should have been investigated in accordance with the discrimination and harassment conduct policy. [Dkt. 53, 41:7-23]

**RESPONSE:** This proposed fact mischaracterizes the cited record. Ms. Deklotz testified that the allegation that a student was physically intimidating another student "would be investigated." Deklotz Dep. 41:7-23. The implication that it should have been investigated, and was not, is unsupported.

80. Deklotz admits that this incident should have been investigated in accordance with the discrimination and harassment policy. [Dkt. 53, 41:24-42:7]

**RESPONSE:** This proposed fact is repetition of proposed fact 79 and mischaracterizes the cited record as explained above. Based on the cited record it appears that Plaintiff intended to propose a fact related to the October 28, 2019 incident involving an inappropriate Snapchat message. The cited record only reflects Ms. Deklotz testimony that this "would be conduct that would be investigated." Deklotz Dep. 41:24-42:7.

81. Kaminski does not remember following up after the discipline was issued and does not recall contacting S.Q. [Dkt 48, 10:10-14]

**RESPONSE:** This proposed fact is vague as it does not identify which discipline or incident it refers to. Based on the cited record, it appears that Plaintiff is referring to the Snapchat incident where a student took a picture of himself with the "N" word written across the picture. Kaminski Dep. [ECF 48] 9:9-10; 12:13-20. Ms. Kaminski did not recall what she did after issuing discipline in this situation or if she contacted S.Q., but her recollection years later is immaterial to summary judgment.

82. Kaminski admits that she never inquired to S.Q. to determine if there was an injury and simply assumed there was not. [Dkt. 48, 13:8-15]

**RESPONSE:** This proposed fact mischaracterizes the cited record. Ms. Kaminski stated that she did not identify any injury in the Behavior Detail Report because she determined based on the information that there was no injury and that S.Q. did not report any injury. Kaminski Dep. 13:8-14:145:5.

83. When asked why she did not ask S.Q. if she was injured, Kaminski states, "I just didn't." [Dkt. 48, 15:19-20]

**RESPONSE:** This proposed fact mischaracterizes the cited record. Ms. Kaminski stated that she would not use the terminology of "injury" when investigating an allegation of harassment or discrimination. Kaminski Dep. 15:10-20. This fact is also immaterial to summary judgment.

84. Kaminski failed to include material information involving the allegations with the word nigger and snapchat into behavioral detail report and cannot confirm why she did not do so. [Dkt. 48, 22:13-16, 21-24]

**RESPONSE:** This proposed fact is not supported by the cited record. The Behavior Detail Report shows that the student was disciplined for multiple incidents including "using language online during the school day that would be unacceptable in the classroom, and by engaging in disrespectful conduct online towards another student." [ECF 45-6]. Ms. Kaminski only testified that she did not recall why she did not use the "N" word or the term Snapchat in the report. Kaminski Dep. 22:21-23:3. This fact is also immaterial to summary judgment.

85. Kaminski purports that she issued a suspension but cannot confirm that the student served it [Dkt. 48, 28:5-11]

**RESPONSE:** This proposed fact is not supported by the cited record and Ms. Kaminski did not "purport" to issue a suspension. Ms. Kaminski stated that the Behavior Detail Report is evidence that the student was suspended and that she had "no reason to believe that he

24

didn't serve it." Kaminski Dep. 26:18-28:11. The Behavior Detail Report [ECF 45-6] was authenticated by Ms. Kaminski and the student's attendance records establishes that he served the suspension. [ECF 44-7].

86. Kaminski admits that she never even took notes in relation to this incident. [Dkt. 48, 31:6-7]

> **RESPONSE:** No dispute that Ms. Kaminski stated that she did not believe she took notes regarding this Snapchat incident, but her investigation file contained a picture of the Snapchat with a note. [ECF 45-1]. This fact is also immaterial to summary judgment.

87. Kaminsky admits that she never took notes related to the investigation in this matter. [Dkt. 48, 31:7-11]

> **RESPONSE:** This proposed fact is vague as it does not identify which discipline or incident it refers to. Based on the cited record, it appears that Plaintiff is referring to the September 3, 2020 Snapchat incident that was investigated by Mr. Bestor. Kaminski Dep. 31:8-11. Ms. Kaminski did not investigate this incident. Bestor Dep. 37:2-13; [ECF 46-2; 46-3; 46-5; 41-1].

88. Kaminsky claims s[t]hat she was not part of the investigation. [Dkt. 48, 46:16-25]

> **RESPONSE:** No dispute that Ms. Kaminsky stated that she was not part of the September 2, 2020 Snapchat incident investigation.

89. Kaminsky admits that she did not give S.Q. a form to file a formal complaint because she understood that a formal complaint could be a verbal report which is followed up on. [Dkt. 48, 31:16-32:15]

> **RESPONSE:** No dispute that Ms. Kaminski did not give S.Q. a form to file a complaint, but this fact is immaterial to summary judgment.

25

90. Bestor agreed that the snapchat message, "Black lives don't matter, you stupid ass nigger," should be handled in accordance with Kettle Moraines School District discrimination and harassment policy. [Dkt 50, 37:14-22]

**RESPONSE:** This proposed fact mischaracterizes the cited record. Mr. Bestor responded "Correct" to the question "that statement would also fall under the discrimination and harassment policy." Bestor Dep. 37:19-22.

91. Bestor determined that there was no injury to S.Q. because there was no physical injury. [Dkt. 50, 43:4-9]

**RESPONSE:** No dispute that Mr. Bestor filled in "no injury" on the Behavior Detail Reports because there was no physical injury. Bestor Dep. 43:4-9; [ECF 46-5].

92. Bestor acknowledges that this investigation was handled at the school level whereas Bestor looked at everything and issued findings and consequences and only maybe as an FYI passed it along to a superintendent. [Dkt. 50, 44:10-20]

**RESPONSE:** This proposed fact is vague, ambiguous, and compound. Mr. Bestor's deposition speaks for itself. He conducted the investigation, "looked at everything, issued our findings and consequences" and then advised the superintendent of those things. Bestor Dep. 44:1-24.

93. Bestor stated that 3 students telling him a student used the word nigger was not enough evidence, but instead would need proof like a "Snapchat, text message, or video recording, or non-partial teacher in the hallway overhearing the comment before proceeding with a consequence. [Dkt. 50, 52:16-53:1]

**RESPONSE:** This proposed fact mischaracterizes the cited record. In discussing why he could not issue a discipline to a student for allegedly using a racial slur with no evidence,

26

Mr. Bestor stated that: "As I say with a lot of students when it becomes -- obviously this is a racially-charged statement, but any time there's a he said/she said type of case, I told the three girls and I tell students all the time there's no reason I don't believe everything you're telling me, and there's no reason I don't believe what the other students are telling me. And . . . until the evidence is there, right, I would fairly give someone a consequence based on the evidence I do have, their parents and that student would be very upset with me, and that puts me in a very difficult position because I know I'm upsetting one group of students. Again, I have no reason not to believe them and everything they're telling me, and they want a consequence to be issued, and unfortunately, I can't do that to someone that's telling me that's not true, I never said that, and you have no proof of it. And until I have that proof, like a Snapchat or a text message or a video recording or perhaps a non-partial teacher in the hallway that overheard the comment, then I can proceed pretty confidently on a consequence." Bestor Dep. 51:24-53:1.

94. Deklotz admits that this incident should have been investigated based on the discrimination and harassment policy. [Dkt. 53, 42:8-15]

   **RESPONSE:**     The cited testimony does not support this proposed fact. At that page of her deposition transcript, Ms. Deklotz was asked about the September 3, 2020 snapchat incident, not the incident cited in paragraph 94. The question presented to Ms. Deklotz was whether this conduct "would also be conduct that should be investigated by the anti-discrimination and harassment policy." Deklotz Dep. 42:8-15.

95. The district failed to facilitate an apology from any of the offenders of the (7) incidents nor inform S.Q. of their findings and provide appellate rights consistent with District discrimination and harassment policy. [Dkt. 62-S.Q. Declaration]

**RESPONSE:** No dispute that S.Q. made this statement in her declaration. However, Ms. Crumble testified that the perpetrator from the 2017 incident apologized. Crumble Dep. 24:6-21. Moreover, it is immaterial to summary judgment that the District did not inform S.Q. of the results of its investigations or provide appellate rights because S.Q. and Ms. Crumble never made a formal complaint to the District pursuant to District policy.

96. Ms. Wroblewski was aware of the racist comment directed at by another student, "Where did Tink go," after the lights were turned off by Wroblewski, evidenced by her standing less than two feet away from the perpetrator, and subsequent observation of the class erupting into laughter immediately after followed by direct eye contact with S.Q. immediately after the comment was made. [Dkt. 62-S.Q. Declaration]

**RESPONSE:** This proposed fact is a mischaracterization and is not supported admissible evidence. Plaintiff's declaration supporting this claim is an inadmissible sham affidavit. *See James v. Hale*, 959 F.3d 307, 317 (7th Cir. 2020). In her deposition testimony Plaintiff testified that Ms. Wroblewski was at the front of the room by the door, turning off the lights and that she and the student who made the comment were in the back of the room. S.Q. Dep. [ECF 54] 10-11:15-6. She also testified that she "figured" the teacher heard the comment, but never mentioned it to her. S.Q. Dep. 10:8-14. This contradicts her declaration that the teacher was two feet from the commenter and "must" have heard the comment. She offers no explanation for the conflict. Additionally, Plaintiff cannot claim that the teacher "must have" heard the comment as she has no personal knowledge of what someone else heard, and this does not create a disputed issue of fact. *See Formella v. Brennan*, 817 F.3d 503, 512 (7th Cir. 2016). The Seventh Circuit has rejected the argument that because teachers are closely monitoring students, they "must

have noticed" inappropriate behavior. *See Gabrielle M. v. Park Forest-Chicago Heights*, 315 F.3d 817, 823 (7th Cir. 2003).

97. On February 24, 2020, during the Cultural Advisory Meeting, Ebony Crumble sat directly next to Superintendent Deklotz and informed her of the incident and harms resulting in March of 2019, during Ms. Wroblewski's class, who then acknowledged and pledged to investigate the complaint that a student made a racially derogatory statement to S.Q. "Where did Tink go?" immediately after the lights were turned off in resulting in the class erupting in laughter. [Dkt. 63-Ebondy Crumble Declaration]

   **RESPONSE:**      This proposed finding is vague, ambiguous, and compound. There is nothing to support that claim that that a statement of "Where did Tink go?" was severe or pervasive race based harassment. The declaration contradicts Ms. Crumble's deposition testimony that she raised the issue one to two years after the incident occurred. Crumble Dep. 88:12-23. And the claim that Ms. Deklotz pledged to investigate also contradicts Ms. Crumbles testimony that: "She never followed up. She never asked more details about the situation. She never said, 'What teacher was it?' She never had any type of follow-up question as to what that incident was about, how to prevent it. Nothing." Crumble Dep. 87:24-88:3. She also reiterated this later in her testimony, claiming that Ms. Deklotz "showed no concern, no follow-up. She had no questions for me or for any more details regarding the incident, not the teacher that it happened with. There was just no reaction whatsoever." Crumble Dep. 122:17-21. Ms. Crumble offers no explanation for the change in her testimony. She was asked in her deposition if she had any documents that "would refresh your recollection as to things that happened or when those things happened in regard to complaints of bullying or harassment" and she responded that she did not. Crumble Dep. 32:3-36:5. Plaintiff does not offer facts to invoke any of the three exceptions to the sham-affidavit rule.

*James*, 959 F.3d at 317. The Crumble Declaration is a sham affidavit.

98. Staff members were required to follow the reporting procedures for discrimination and harassment complaints and inform the designated administrators because "the district cannot do anything to remedy the problem, if the district does not know that the problem exists." [Exhibit A-KMSD Document Production-Discrimination and Harassment Prohibited Policy, KMSD 46 ¶5].

**RESPONSE:** This proposed fact is a mischaracterization of the cited record and the policy speaks for itself.

99. The discrimination and harassment suffered by S.Q. resulted in feeling isolated, unsafe with her peers, hopeless that life will get better, and uncertain that she will be able to move forward, in addition to believing that she would be alive long enough to attend college. [Exhibit E-Dr. Layton Tholl Evaluation, pg. 14]

**RESPONSE:** No dispute that Plaintiff reported these feelings to Dr. Layton Tholl, but Plaintiff fails to link these feelings to racial harassment. She ignores that her acts of self-harm and depression predated any harassment. Levenberg Dep. 28:8-16. She also ignores that her mental health is affected by the fact that she was sexually assaulted by "classmates and a family member" when she was younger, and that she was physically and emotionally abused by her father. [ECF 65-5, p. 10]; Crumble Dep. 60:1-22. While Plaintiff has mental health issues, she fails to offer anything to show this Court that her mental health issues were caused by the District's alleged deliberate indifference to harassment.

100. S.Q. has engaged in self-harm, had suicidal attempts on several occasions, experiences substantial depression, and an inability to concentrate and operate to her full capacity as a student, directly caused by the harassment and discrimination faced related to the (7) incidents in this lawsuit that occurred within the Kettle Moraine School District. [Dkt. 62-S.Q. Declaration]

30

**RESPONSE:** No dispute that S.Q. made these statements in her declaration, but they are not founded in fact nor are they admissible. *See* Response to Paragraph 99. Plaintiff's declaration as to causation is not admissible to prove any matter in this case. Plaintiff is not qualified to offer an opinion on causation, nor does she address how she can differentiate causation from mental health issues attributable to the fact that she was sexually assaulted by "classmates and a family member" when she was younger, and that she was physically and emotionally abused by her father. [ECF 65-5, p. 10]; Crumble Dep. 60:1-22.

Dated this 31st day of May, 2022.

KOPKA PINKUS DOLIN PC
Attorneys for Defendant

By:  /s/ Ronald S. Stadler
Ronald S. Stadler
State Bar No. 1017450
Jonathan E. Sacks
State Bar No. 1103204

N19W24200 Riverwood Dr, Suite 140
Waukesha, WI 53188-1191
telephone: 847-549-9611
facsimile: 847-549-9636
e-mail: rsstadler@kopkalaw.com
         jesacks@kopkalaw.com

31